**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION**

VIRGINIA MCKEE NOEL                                                      PLAINTIFF

v.                                    No. 3:10CV00107 JLH

LIBERTY BANK OF ARKANSAS                                           DEFENDANT

## OPINION AND ORDER

Virginia Noel brings this action against Liberty Bank of Arkansas seeking an accounting related to assets owned by her mother's trust, the Rose N. McKee Living Trust, held by Liberty Bank as a custodian.  Noel alleges that she has discovered numerous errors and discrepancies in connection with the custody account and transfers of investment securities made therefrom.  Noel alleges that she has repeatedly asked Liberty Bank to account fully for all of its dealings concerning assets belonging to her mother and the trust but that Liberty Bank has failed to explain in sufficient detail all errors and discrepancies.  Liberty Bank contends that it has provided Noel with all documents related to the custody account and has responded to all of Noel's questions well beyond the scope of any legal duty it might have.  Liberty Bank has moved for summary judgment, and Noel has responded.  For the following reasons, Liberty Bank's motion for summary judgment will be denied.

## I.

On May 7, 2001, Rose N. McKee entered into a Custodian Agreement with the Bank of Jonesboro,[1] whereby Rose McKee delivered certain property to the bank, which promised to hold the property in custody, follow any directions of Rose McKee regarding the property, and perform other functions.  The agreement contained the following provisions:

---

[1] Subsequently, the Bank of Jonesboro became Liberty Bank.  Doc. #45.

(1).   The Owner has delivered, or will upon execution hereof, deliver to the Custodian the property described in Schedule A attached,[2] to be held in the custody of the Custodian separate from all other property and managed by the Custodian as herein provided.

(2).   The Custodian shall make or settle sales and purchases and take other actions with respect to property, securities and cash held hereunder as the Owner or the Owner's designated investment manager or named fiduciary/administrator, shall from time to time authorize in writing.  Notwithstanding the forgoing, the Custodian may in its discretion temporarily invest principal cash balances without prior approval of the Owner.

(3).   The Custodian shall keep accounts of income and principal and shall collect all interest, dividends and other income and shall remit the net income to the Owner quarterly or as the Owner may otherwise direct, and shall collect all payments and proceeds of the principal or any of the securities having a maturity date and make such disposition thereof as the Owner may authorize in writing.

(4).   Certificates of shares of stock and other registered securities held hereunder maybe registered in the name of the Custodian's nominee, with its address in care of the Custodian, and as to securities registered in the name of the Owner, the registered address of the Owner shall be the business office of Custodian, and the Custodian is authorized to receive and open all communication so addressed to the Owner, and to endorse and collect in the name and on behalf of the owner, all checks and other remittances payable to the Owner so received by it and give receipts and acquaintances thereof.

(5).   With regards to securities held in our Custodian's nominee name, however, SEC Rule #14b-1(c) requires Custodian to supply any requesting company the Owner's name, address, and security positions of securities in that company unless Owner has directed Custodian to do otherwise.

(X) No, do not release this information  () Yes, release this information.

(6).   Comptroller of Currency Regulations provide that the Owner is entitled to receive information concerning securities transactions of the account in the form of a broker confirmation or its equivalent even though the Custodian makes purchases and sales only upon written direction.  This information will be furnished to the Owner in the form of the regular statement of their account on at least a quarterly basis and the Owner agrees that this information is sufficient and further information is not required.  The Custodian shall furnish the Owner, within a reasonable time

---

[2] No schedule A is attached.

after December 31 of each year, or at other times if the fiscal year of this agreement is other than a calendar basis, a full annual accounting with figures as shown on its records covering the deposited securities and receipts and disbursements of income and principal for the assistance of the Owner in the preparation of Owner's annual 5500 income tax return.

(7).  The Owner agrees to be responsible for all expenses, taxes, or other charges or liabilities incurred by Custodian in connection with this account, and the Custodian is hereby authorized to charge this account accordingly.

(8).  The Custodian may, without the necessity of consulting the Owner, exercise routine conversion privileges, buy or sell fractional shares, sell rights or execute proxies pertaining to shares of stock held hereunder, including shares held of The Bank of Jonesboro, Jonesboro, AR unless such authority is vested in a designated investment manager by the Owner.

(9).  The Custodian shall receive compensation for its services in accordance with its published schedule of fees in effect at the date the services are rendered.

(10).  Any property held may be withdrawn by the Owner at any time upon written direction of the Owner delivered to the Custodian, and the Owner may deliver to the Custodian additional property acceptable to it to be held under the term hereunder.

(11).  The Owner and not the Custodian shall be responsible for money or securities paid or delivered to any broker or other party upon directions for the Owner.

(12).  The directions from the Owner or Vicki Waddill (X) may, or ( ) may not be oral; however the Custodian reserves the right to require any such directions be in writing. The Owner assumes all risks that result from any action taken by the Custodian in good faith on any such communications.

(13).  Either party upon written notice delivered to the other party may terminate this agreement in its entirety at any time.

(14).  The Owner also directs Southeastern Asset Manger to be her Investment Advisor.

On December 15, 2005, Rose McKee created a living trust, the Rose N. McKee Living Trust.  The

ownership of the assets in the custody account passed to the Trust.  On February 27, 2006, John

McKee,[3] as co-trustee for the Trust, executed a new Custodian Agreement with Liberty Bank.  The 2006 agreement contained the same terms as the 2001 agreement but added a clause stating, "The Owner assumes all risks that result from any action taken by the Custodian and waives all responsibility of the Custodian."  The 2006 agreement named "Southern Asset Manager" rather than "Southeastern Asset Manager" to be the Investment Advisor and changed the name of the bank to "Liberty Bank."

In May of 2007, Liberty Bank transferred a number of investment securities to Stephens, Inc., when the co-trustees of the Trust, Noel and her brothers, Sanders and John McKee, decided to move the Trust's assets out of the custody account at Liberty Bank.  Liberty Bank concedes that errors were made during the transfer.  Approximately $3 million worth of investment securities over and above the actual assets purportedly within the custody account were transferred along with the assets in the account.  On August 6, 2007, Noel requested documentation related to the custody account from Liberty Bank.  Liberty Bank responded that it could not release personal information to her and informed her there was no schedule A.  Later that month, Noel made another request and Liberty Bank responded with a letter stating, among other things, that the error regarding the securities transfer was corrected and that no schedule A for the account exists.  In April of 2008, Noel requested information about the transfers to Stephens.  Noel received a response from Liberty Bank's attorney stating that Liberty Bank had provided everything it was required to send to Noel. Noel conferred with Liberty Bank's CEO who ordered that bank employees provide responses to Noel's requests.  In June of 2008, Liberty Bank provided Noel with responses.  Liberty Banks

---

[3] According to the complaint, John McKee was Rose's son and was invested with her power-of-attorney in when Rose McKee developed concerns about the onset of Alzheimer's disease.

asserts that it provided Noel with all the documentation it has relating to the custody account.  Noel

alleges that in early 2009 she learned that assets may exist that should have passed to her mother but

may not have, and that the family's accounting firm could not produce certain documents or confirm

that he father's estate had closed.[4]  Noel alleges that this prompted her to reconsider the transfer

errors made during the 2007 transfer of securities.  Noel's attorney subpoenaed Liberty Bank for all

information relating to Rose Mckee's financial affairs.  Liberty Bank responded with the

documentation it had previously sent stating that this was all the information it had that was covered

by the subpoena.  Noel contends that Liberty Bank's responses have not been accurate or complete.

She contends that the transfer errors indicate that there are additional assets that are unknown to her.

Specifically, Noel believes the $3 million in investment securities that were purportedly over-

delivered actually belong to the trust.  She also alleges that her brothers, who are co-trustees to her

mother's trust, have actively worked to interfere with her attempts to ensure that the accountings for

the trust are accurate.

   Because Noel is dissatisfied with Liberty Bank's responses, she commenced this action for

an accounting.  Liberty Bank has moved for summary judgment contending that the undisputed

evidence establishes that Liberty Bank does not owe the Trust anything, and that it has provided

more extensive responses than required by law.  Liberty Bank relies on the affidavit of Steve Baker,

the Senior Vice President/Trust Officer at the bank, that all assets received in the custody account

for the benefit of Rose McKee and her Trust were accounted for and properly transferred out

pursuant to the instructions of Stephens.  Baker testified that Liberty Bank has no funds belonging

---

[4] According to the complaint, Noel's father, Dr. Bobby McKee, was a successful ophthalmologist who practiced in the Jonesboro area, and passed away in 1989.  His widow, Rose McKee, was the sole beneficiary of his will.  Rose McKee passed away in 2007.

to or for the benefit of Rose McKee or her Trust.  He also testified that Liberty Bank has provided

Noel with all documents in the custody of Liberty Bank relating to the custody account.  Liberty

Bank has attached all of the custody account's monthly statements from June of 2001 through June

of 2007 to Baker's affidavit.  Similarly, Cheryl Weathers, the Vice President and Trust Officer of

Liberty Bank, testified by affidavit that she has handled certain aspects of the custody account as

that all funds received by Liberty Bank were accounted for in monthly statements.  She testified that

all funds held pursuant to the custodian agreements have been accounted for and that all monies held

pursuant to the agreements were paid to, at the direction of, or on behalf of Rose McKee or those

acting on her behalf.  Weathers stated that currently there are no funds belonging to Rose McKee

or the Trust held at Liberty Bank pursuant to the custodian agreements.

Noel identifies a plethora of purported discrepancies relating to the custody account that, she

contends, raise a number of fact questions regarding the accuracy of Liberty Bank's claim that it has

accounted for all funds pertaining to the account and, consequently, preclude summary judgment.

Furthermore, even if all funds from the custody account have been transferred, Noel contends that

she is entitled to an adequate explanation of the discrepancies.  Noel contends that Liberty Bank's

failure to fully explain all of the discrepancies establishes that the bank has failed to account for its

actions.

**A.     Discrepancies Associated with Monthly Account Statements**

First, Noel contends that a number of discrepancies associated with the monthly account

statements render the statements unreliable.  Adam Warren, an expert for Noel, states in his affidavit

that, while most of the statements appear correct, a number of the statements appear to have

irreconcilable errors.  Specifically, the 9/30/01 statement states that the ending cash balance was $0,

while the 10/01/01 and 10/31/01statement states that the beginning cash balance was -$103,312.50.

Similarly, the 11/01/02 to 11/30/02 and 01/01/03 to 01/31/03 statements have ending cash balances

of $0, but should have balances of $35,000.  Next, the account number and name for statements from

06/01/01 to 06/30/03 were different from than those from 07/01/03 to 01/31/06 and 02/01/06 to

04/30/07.  In addition, the December 2003 statement reflects a balance of $8,702,574.24, but a

document dated March 12, 2004 reflects a "Prior Y/E Market Value" of $8,712,130.48.  The

November 2005 statement states that the Long Term Capital Gain Distribution from Longleaf

Partners Fund ("LPF") mutual fund was $187,852.70.  The LPF fund only paid $1 per share in 2005.

Because Rose McKee had 180,200.205 shares that year, she should only have received $180,200.21.

Next, the February 2006 statement reflects a purchase of 155.909 shares of American Funds Growth

Fund of America ("AFG") on February 3, 2006,[5] but a listing of Liberty Bank transactions for this

mutual fund shows no purchases from this fund for that date.

Liberty Bank replies that Warren's affidavit does not actually contradict the affidavit

testimony of Barker and Weathers that, when all statements are read together, the cash balances can

be balanced to the penny.  Although Baker testified that the account was not missing $35,000, his

explanation is not particularly clear.  In his deposition, Baker testified that the monthly statement,

standing alone, balanced if read properly.  According to Baker's deposition testimony, the account

appeared to be $35,000 short as a result of a mistake commonly made by novices in reading trust

documents.  In an affidavit submitted in reply to Noel's expert, however, he says that the

surrounding monthly statements must be taken into account for the statements to balance.  He

recreates monthly statements for October 2002 through January 2003.  The re-creation includes a

---

[5] As discussed below, Liberty Bank erred in making this purchase.

note saying that monthly distribution checks issued in one month were not "released from pending status" until the following month when sufficient cash funds were available in the account, which purportedly accounts for the missing $35,000.  Liberty Bank does not address the 10/01/01 to 10/31/01 statement discrepancy of $103,312.50.  Nor does Liberty Bank explain the different account numbers and names, or the discrepancies between the December 2003 statement and March 2004 document showing a different year-end market value.  Liberty Bank does point out that Noel's exhibit shows that the mutual fund paid both long term and short term gains to certain shares and that the total distribution was $1.18 for some shares.  Liberty Bank contends that this explains why the November 2005 statement reflects a larger Long Term Capital Gain Distribution than merely $1.00 per share, but it does not specifically explain how the $187,852.70 figure resulted from the LPF dividends.  If Liberty Bank were correct that the distribution was $1.18 per share, the total dividend should have been $212,636.24 (180,200.205 shares times $1.18 per share) instead of $187,852.70.  Nor does Liberty Bank's explanation account for the fact that the additional $0.18 is for short term gains, whereas the $187,852.70 figure is identified on the statement issued by Liberty Bank as "Long Term Capital Gain Longleaf Partners Fund."  Liberty Bank does not explain why its statement has an entry for a deposit from a long term capital gain fund if the transaction included both long and short term gains.  As to the purchase of the AFG shares, Liberty Bank argues that the issue of when exactly the 155.909 shares were purchases is irrelevant because, as Baker testified, Liberty Bank admitted that it erred in purchasing the funds but ultimately transferred them to Stephens along with the rest of the assets in the custody account.

**B.      Discrepancies Associated with Tax Information Supplied by Liberty Bank**

8

Noel also points to alleged discrepancies in tax documents provided by Liberty Bank relating to the custody account.  Noel contends that Rose McKee was the only Liberty Bank customer to own Longleaf Small-Cap Fund ("LLSC") and LPF shares in 2002.  Nevertheless, while Liberty Bank's 1099-DIV form stated that these funds paid Liberty Bank $46,064.51 in dividends that year, Rose McKee's 1099-DIV form only shows $791.70 in dividends.  Next, Noel points to a 1099-DIV form in 2003 referring to a 401K plan for which Liberty Bank was the payer but about which Noel knows nothing.  Further, Rose McKee's 2004 1099-DIV form reflects that 100% of her LLSC and LPF shares were "qualified dividends," but Longleaf's instructions indicate that only 41.0659% of the LLSC dividends for 2004 were qualified.  Again, in 2006, Rose McKee's Form 1099-DIV indicates that she had $182,848.50 worth of "ordinary dividends," but an analysis based on Longleaf's tax information form indicates that there should only have been $84,393.26 of recognized income from the dividends.  Longleaf tax instructions indicate that only 56.96% of its dividends were qualified for 2006, but Liberty Bank's 1099-DIV reflects that 100% of these dividends were qualified.  Next, the 2006 Form 1099-DIV contains a reference to the Vanguard Total Stock Market Index mutual fund next to a note stating "Total/Qualified 182,848.50," but Liberty Bank has not produced any statements reflecting this mutual fund.  Finally, Liberty Bank's 2006 Form 1099-DIV reads "Rose N. McKee" not "Rose N. McKee Living Trust" even though Liberty Bank had purportedly moved all assets into the trust custody account in February 2006, and even though the trust is properly named in the 2006 Form 1099-INT.

Liberty Bank replies that the Form 1099-DIV was generated by SunGard[6], not Liberty Bank. Further, Weathers repeatedly testified that there may have been other customers at Liberty Bank who

---

[6] SunGard provides accounting systems for banks.  Liberty Bank is one of its customers.

owned Longleaf shares.[7] Liberty Bank also points to Baker's deposition testimony that all dividends are treated by SunGard as qualified, and that the bank only fixes the 1099 forms to reflect long-term and short-term gains if requested to do so by the customer.  Liberty Bank contends that it is not responsible for properly classifying the nature of dividends.  Baker testified that, while Liberty Bank will provide an amended 1099 form if a customer asks to have the long term gains and short term gain broken out, Liberty Bank is not responsible for ensuring that the dividends are correctly characterized for the purposes of tax filing.  Liberty Bank does not specifically address Noel's questions about the 401K plan, the Vanguard mutual fund reference, or the 2006 form's reference to Rose McKee rather than the trust.

**C.      Discrepancies Associated with Registration of Mutual Funds Belonging to Rose McKee**

Noel next points to discrepancies in the share registrations of Rose McKee's mutual funds. Originally, these funds were registered in Rose McKee's name.  On July 11, 2001, 174,484.762 shares of LPF and 66,314.540 shares of LLSC were received in an account registered to "The Bank." Although Weathers testified that this account was a nominee name for the Bank of Jonesboro Trust Department, the account had an address different from the address of the bank.  The address for "The Bank" was registered to Weathers personally.  On June 17, 2004, 180,200.205 shares of LPF were transferred to an account at Pershing.[8]  On January 31, 2005, 186,765.249 shares of LPF were transferred to a direct fund account registered as Post & Co. 016025.[9]  Weathers testified that she

---

[7] However, her testimony is focused around the date of the transfer errors in 2007.

[8] Pershing was a clearing agent or subsidiary of the Bank of New York.

[9] Post & Co. was a nominee for accounts at the Bank of New York that paid dividends in cash.

did not know who registered the shares in the Pershing account and was not familiar with the Post & Co. account.

Liberty Bank responds that Weather's testified that "The Bank" account had the bank's tax identification number and that the account was set up to avoid extra charges in the SunGard system. Regarding the Pershing transfer, the bank contends that the transfer form is not a Liberty Bank document and cites "Exhibit 12" to the deposition of Giovanni Gonzalez of the Bank of New York.[10] Liberty Bank contends that it is unnecessary for it to explain a document from another bank to provide a complete accounting. Liberty Bank points to testimony by Gonzalez explaining that "Post & Co." and "Wendel & Co."[11] were nominees for certain accounts at the Bank of New York.

## D.    Discrepancies in 2007 Securities Transfers

Noel contends that there are discrepancies in Liberty Bank's explanation of the errors that occurred during the transfer of the mutual fund shares out of the custodian account and to Stephens. In May of 2007, Liberty Bank transferred 79,622.276 shares of LLSC, 79,567.846 shares of AFG, and 190,047.011 shares of LPF to Stephens. Liberty Bank reports that the transfer involved an over-delivery of 3,597.003 LLSC shares, 79,411.937 AFG shares, and 9,846.807 LPF shares, amounting to approximately $3 million of over-delivered shares. Stephens' records indicate that the transfer occurred on days preceding the transaction date on Liberty Bank's records. To complicate the matter further, Liberty Bank made an unauthorized purchase of 155.909 shares of AFG for the

---

[10]  Exhibit 12 has not been provided to the Court.  Liberty Bank filed a condensed copy of the transcript of the deposition of Gonzalez but did not file the exhibits attached to the original transcript.

[11]  Wendel & Co. was the nominee for accounts that reinvested dividends, whereas Post & Co. was the nominee for accounts that paid dividends in cash.

custody account for $5,000 in early 2006. The Liberty Bank statement does not specify where the LLSC mutual funds went. Further, the AFG shares were transferred with a code for the LLSC shares. Although the Stephens' records indicate the number of shares received, the Liberty Bank records do not specify the numbers of shares transferred out. Noel notes that the Stephens' records differ from Liberty Bank's internal history of transactions list regarding the number of shares by .002 shares. Noel also complains that Liberty Bank instructed the Bank of New York not to respond to her pre-litigation inquiries. Noel points out that Stephens used an ACAT transfer form but that Weathers testified that Liberty Bank does not use ACAT. Weathers also testified that certain records related to entering transactions in the system were destroyed. Finally, Noel points out that Liberty Bank's account at the Bank of New York reflects two purchases of LPF shares, but the transfer agent's account reflects a single purchase. The two purchases together equal the single purchase.

Liberty Bank relies primarily upon the testimony of Gonzalez in its response. Gonzalez testified that the Bank of New York made an internal error during the mutual fund transfers in May of 2007. Specifically, he states that there was a mis-communication between the operations individual and the client service representative at the Bank of New York. The error was caused by the belief that the account was a dividend reinvestment account and not a cash account, which resulted in shares being pulled from accounts that actually belonged to other customers. Gonzalez testified that Liberty Bank's instructions were proper and correct. Weathers also testified that the errors were made by the Bank of New York. Liberty Bank points to testimony from Baker that Rose McKee was entitled to only 155.909 shares of AGF, and that the remaining shares were an over-delivery. Regarding the recorded transfer dates, Weathers testified that mutual funds are held by

a third party and that when the instructions are transferred to the third party, the third party must process the request, which creates different dates for (1) when the electronic instructions are given; (2) when the fund company acknowledges the transfer; and (3) when Liberty Bank receives verification of the transfer and can clear the funds off its record.  Baker stated that the delivery occurred and the date is of no consequence.  Liberty Bank contends that even if the date discrepancies have not been fully explained, they do not demonstrate that funds belong to the Trust exist for which it has failed to account.  Liberty Bank concedes that the daily reports about which Weathers testified at her deposition were destroyed after two years.  Baker explained that records relating to a custody account are retained for five years, but the daily sheets are "prepared each day for the previous day's transactions" and these records are separate from account statements are not "a retention record item."  Liberty Bank also points to Noel's response to Stephen's motion for protective order wherein she asserts that she obtained documents from the archives of the Bank of New York "which reflect the final, definitive accounting of each mutual fund transfer."

E.   **Discrepancies Associated with Liberty Bank's Dividends Policy**

Noel also alleges that there are discrepancies with Liberty Bank's policies regarding dividends on Rose McKee's mutual fund shares.  Noel alleges that from 2001 to February of 2004, Rose McKee reinvested all dividend and capital gain distributions from her LLSC and LPF funds into new shares but from November 2004 through 2007 the gains were paid in cash rather than reinvested.  Noel alleges that this change negatively impacted LLSC and LPF shares worth millions of dollars, and that Liberty Bank has not provided documentation that Rose McKee requested the change.  When Noel asked Liberty Bank about the change, she received a written response stating that in 2005 the bank began to pay distributions from mutual funds to all its clients instead of

automatically reinvesting the dividends.  Baker testified that Weathers informed him that the Bank of New York had a requirement that prevented Liberty Bank from automatically reinvesting dividends on mutual fund shares.  Weathers testified that the decision to switch to paying cash benefits was made by Liberty Bank's management.

Liberty Bank responds by pointing out that it had the authority to designate Rose McKee's account as a cash account under the custodian agreement without seeking approval.  Liberty Bank says that it received no request from the accounts' owner to have her account switched back to dividend reinvestment.  Baker testified that the cash was reinvested for McKee's benefit by placing it in a money market fund pursuant to the custodian agreement.  Liberty Bank argues that, regardless of why the account was changed, the fact is that it was changed and this does nothing to establish that there are any funds missing from the Trust.  Liberty Bank does not address the testimony of Gonzalez that Liberty Bank had accounts registered not only with Post & Co. for cash dividends but also with Wendel & Co., under which are registered nominee accounts for which dividends are reinvested.

## F.     Questions Associated with the Bank of New York's Role in the Transfer Discrepancies

Noel also contends that there are discrepancies regarding the Bank of New York's role in the transfers of the mutual funds.  Noel points out that an employee of the Bank of New York wrote in an email that Liberty Bank did not account for dividends over the previous three years when it sent objections for the transfer to Stephens.  Further, the Bank of New York supposedly delivered 190.047.12 shares of LPF, but the Stephen's statement reflects receipt of only 190.047.11 shares.  Noel alleged that the bank did not explain this discrepancy.   A SunGard representative, Mark Cannady, testified that the transfer involved both Post & Co. and Wendel & Co. registrations,

14

which would indicate that some of the funds were held in accounts in which the dividends were reinvested. Moreover, a record appears to show that a deposit was made in Liberty Bank's "Wendel & Co." account—the account used for mutual funds with reinvested dividends—for the benefit of Liberty Bank after 2005, despite Liberty Bank's claim that it did not offer customers the ability to reinvest dividends after 2005.

Liberty Bank responds by pointing out again that the Bank of New York admitted that it had made the mistakes which occurred during the transfer and says that the evidence from the Bank of New York employees supports the position that they accidentally treated the transfers as coming from a dividend reinvestment account rather than a cash account. Gonzalez testified that the .01 rounding error was a result of accounting software. Finally, Baker and Weathers testified that the correct number of shares were delivered despite this rounding error. According to Liberty Bank, any other mistakes attributable to the Bank of New York are irrelevant to this action. Liberty Bank does not specifically address the testimony of Cannady that the transfer included Wendel & Co. registrations nor the evidence that it had funds in the Wendel & Co. account after it purportedly ceased offering dividend reinvestment for client accounts.

## G. Questions Associated with McKee Family Trusts

Noel alleges that there are "troubling questions" associated with family trusts linked to Rose McKee. Noel points to some evidence that there was a transfer to First Bank, now Regions Bank, for the "Rose N. McKee Trust." Noel alleges that she has no knowledge of this trust, but the McKee's family attorney testified that he believes there was a retirement account connected with Dr. McKee's medical practice. Further, there is some evidence of a Rose McKee Account 3 that was held by Regions Bank and transferred to the Bank of Jonesboro, now Liberty Bank. Noel

alleges that the account at Regions Bank was registered as a "custodial account," which is an account for a minor or a retirement account.  Noel contends that it is unclear what relationship this "custodial account" has to the Liberty Bank "custodian account," that Liberty Bank does not maintain "custodial" accounts, only "cust," "Custody," and "Trust" accounts, and that Liberty Bank has never explained this relationship.

Liberty Bank responds by asserting that these issues are immaterial to this case because they refer to documents and potential assets from accounts prior to the receipt of any assets by Liberty Bank.  Liberty Bank states that, regardless of whether Rose McKee had multiple accounts elsewhere, the undisputed testimony of Baker is that Liberty Bank's trust department had only one account for Rose McKee and the Trust, i.e., the custody account.  Baker also testified that there was no retirement plan funds in the account.  Weathers also testified that the terms "custody" and "custodial" are interchangeable terms.

## H.   Questions Associated with the Custodian Agreements

Noel also points to "troubling questions" associated with contracts involving Rose McKee. In 2007, McKee died of Alzheimer's disease, from which she had suffered for more than five years. In 2001 she signed the first custodian agreement.  Noel contends that this agreement grants certain Liberty Bank employees the power to change the registration of mutual funds and open accounts at Liberty Bank or other institutions.  The agreement states that the assets subject to it were to be listed on a Schedule A, but Liberty Bank has not produced such a schedule.  The second section references a "named fiduciary/administrator," but Noel alleges that no such person is known to Liberty Bank. Similarly, sections 2 and 8 of the agreement reference an "investment manager" but Liberty Bank does not know if there was such a person.  The second custodian agreement bears two signature lines

for the Owner, but only one line is signed.  The second agreement includes a clause saying that the

"owner assumes all risks that result from action taken by the Custodian and waives all responsibility

of the Custodian."  That clause was not in the first custodian agreement.  Even so, Baker stated in

a letter to McKee that the second agreement was identical to the first other than a change of name,

which was not true.  In addition, Liberty Bank states that Noel's brother, a co-trustee, selected

"Southern Asset Manager" to be the investment advisor, but Noel alleges that she does not know

the identity of this entity and Liberty Bank will not reveal it.  Further, Liberty Bank claimed it did

not know who drafted its custodian agreement.  Nor has Liberty Bank offered documents that show

that either agreement was terminated.

      Liberty Bank responds, first, by noting that Noel does not actually rely on the Custodian

Agreements for her claim that certain Liberty Bank employees had the power to change the

registration of mutual funds and open accounts at Liberty Bank or other institutions.  Rather, Noel

cites a Liberty Bank "Corporate Resolution" that grants certain employees the power "to execute

any and all agreements, contracts, assignments, endorsements and issuance of checks or drafts,

reports, documents, and other papers in connection with the Trust Department of Liberty Bank of

Arkansas."  Liberty Bank notes that this document does not grant its employees' the power to

change the registration of mutual funds.  Baker testified that corporate officers may have the power

to open accounts but that this would be irregular.  Further, Liberty Bank points out that there is no

evidence that any mutual funds belonging to McKee were ever registered without proper

authorization.  Liberty Bank explains that a schedule A does not exist for the account because, as

Weathers testified, the bank used the statement from the prior custodian trustee.  Liberty Bank

contends that Noel has been provided with the statement from the prior custodian trustee, Regions

Bank, during discovery.  Regarding the remaining allegations, Liberty Bank argues that it was not responsible for selecting an "investment advisor."  Baker testified that the term "Southern Asset Manager" was a secretarial error, and that it should have read "Southeastern Asset Manager."  Baker also testified that he was unaware of the addition of the liability clause when he stated that the updated custodial agreement was unchanged from the prior agreement, except for the owner's name. Baker also testified that an account closes when the assets are all taken out of it and that no separate documentation establishing this is necessary.

## I.      Questions Associated with the Loan Guarantee

Noel points out that, less than five years before she died, McKee signed an unlimited loan guarantee to the Bank of Jonesboro.  Liberty Bank at first denied this document existed but later produced it, and has not produced any documents, besides the guarantee itself, relating to this guarantee, any loans to which it was applied, or any related documents evidencing its amendment or termination.

Liberty Bank responds that, although there was confusion about whether a guarantee existed, this document was eventually provided to Noel.  Liberty Bank argues that these facts are irrelevant to the issue in this action, namely, whether Liberty Bank has any assets which belong to the Trust.

## J.      Questions Associated with Loan Collateral

Noel asserts that McKee also pledged certain assets worth more than $8 million as collateral for a loan of a mere $175,000 on March 12, 2004.  On the loan documents, Liberty Bank states that it is the trustee for the custodian account.  Noel did not learn of the loan until after her mother died, at which point it had gone into default.

Liberty Bank contends that these allegations are irrelevant to the request for an accounting. Further, the bank points out the Rose McKee is free to pledge what property she wishes as collateral for a loan.

**K.    Questions Associated with a "Third Party Administrator"**

Noel alleges that the Bank of New York records indicate that AFG shares from a Keogh retirement account were delivered to Stephens.  Dr. McKee had a Keogh retirement plan when he died at Mercantile Bank, which is now Regions Bank.  Weathers testified that Liberty Bank's retirement accounts were handled by a third party administrator.  Baker testified that he was not aware of a third party administrator regarding the AFG shares transferred to Stephens.  AFG provided a transfer agent record for the account in which the AFG transfer error occurred, and that record included a notation "TPA: 0990031."  There is evidence that "TPA" stands for "third party administrator" and that the number 0990031 refers to the Bank of New York.

Liberty Bank responds that Gonzalez testified that the "Transaction History" document cited by Noel was actually a "DST" document, not a Bank of New York document.  Liberty Bank contends that there is no evidence in the record that Mr. McKee had a Keogh retirement plan. Further, Weathers testified that Liberty Bank has no Keogh accounts.  Liberty Bank points out that the "Transaction history" document cited by Noel reveals that, whatever account it is, there are zero shares with zero value in it.  Thus, Liberty contends that, to the extent Noel is attempting to offer evidence that Liberty Bank may have funds belonging to McKee that are unaccounted for, this document fails to constitute such evidence.  Liberty Bank does not address the fact that the transfer agent record provided by AFG for the account in which the transfer error occurred includes a

19

notation that appears to indicate that the Bank of New York's third party administrator was involved with the account.

**L.      Stephens**

Finally, Noel claims that the account at Stephens received a distribution from the Keogh account. Stephens never explained the transfer of 190,047.012 LPF shares and Stephen's customer account statement mysteriously cuts off on May 25, 2007. Baker testified that Noel should request answers from Stephens.

Liberty Bank responds to these claims by asserting that these are merely allegations against Stephens that are outside the scope of this action and irrelevant.

## II.

A court should enter summary judgment if the evidence demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986). The moving party bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). If the moving party meets this burden, the nonmoving party must respond by coming forward with specific facts establishing a genuine dispute for trial. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). In deciding a motion for summary judgment, a court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *PHL Variable Ins. Co. v. Fulbright McNeill, Inc.*, 519 F.3d 825, 828 (8th Cir. 2008). A genuine dispute exists only if the evidence is sufficient to allow a jury to return a verdict for the nonmoving party. *Anderson*, 477

U.S. at 249, 106 S. Ct. at 2511.  When a nonmoving party cannot make an adequate showing sufficient to establish a necessary element of the case on which that party bears the burden of proof, the moving party is entitled to judgment as a matter of law.  *Celotex Corp.*, 477 U.S. at 322-23, 106 S. Ct. at 2552.

## III.

"The cause of action for an accounting is a restitutionary remedy."  *In re Nat'l Audit Def. Network*, 332 B.R. 896, 918 (Bkrtcy. D. Nev. 2005) (citing 9 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil 2D* § 2310 (1995); 1 Dan B. Dobbs, *Dobbs Law of Remedies* § 4.3(5) (2d ed. 1993); Joel Eichengrun, *Remedying the Remedy of Accounting*, 60 Ind. L.J. 463 (1985)).  It is "an equitable remedy designed to provide a means for compelling one, who because of a confidential or trust relationship has been entrusted with property of another, to render an account of his actions and for the recovery of any balance found to be due."  *A & P's Hole-In-One, Inc. v. Moskop*, 38 Ark. App. 234, 239, 832 S.W.2d 860, 863 (Ark. App. 1992) (citing 1 Am. Jur. 2d *Accounts and Accountings* § 45 (1962)); *see also* Eichengrun, *supra* at 463 ("The true accounting remedy yields a restitutionary award of the defendant's profits wrongfully obtained from the use of the plaintiff's property.  The plaintiff must establish some basis for the obligation to account, the defendant is ordered to account, and the plaintiff then gets an order directing payment of the sum of money found due.").  Understood in this manner, an accounting remains a viable cause of action under Arkansas case law.  *See Estates of McKnight v. Bank of Am.*, N.A., 372 Ark. 376, 383, 277 S.W.3d 173, 179 (2008); Prudential Ins. Co. of America v. Frazier, 323 Ark. 311, 312, 914 S.W.2d 296, 297 (1996); *Walters-Southland Inst. v. Walker*, 217 Ark. 602, 232 S.W.2d 448 (1950) ("It has also been held that an accounting may be had against a fiduciary to determine whether there

is, in fact, anything due the plaintiff."); *Moskop*, 38 Ark. App. at 239, 832 S.W.2d at 863.  When a party brings an action for an accounting, "the court must either issue an order for the amount due from the [fiduciary] where improper administration of the [assets] is found or issue an order that nothing is due."  *Estates of McKnight*, 372 Ark. at 383, 277 S.W.3d at 179 (citing 1 Am. Jur. 2d *Accounts and Accounting* § 67 (1994)).  The burden of proof lies upon the party asked to account for its actions.  *Walters-Southland Inst.*, 217 Ark. at 609, 232 S.W.2d at 452; *Moskop*, 38 Ark. App. at 238,39 832 S.W.2d at 862-63l.

Liberty Bank contends that Noel cannot bring an action for an accounting against it because the bank did not owe McKee's trust any fiduciary duties beyond those of a "mere bailee."  *See In re Nat'l Audit Def. Network*, 332 B.R. at 918 -19; Eichengrun, *supra* at 465; *cf.* Dan B. Dobbs, *supra* at § 4.3(5).  Liberty Bank contends that it was merely a custodian without discretionary authority for investing assets and with the limited duty to follow the specific directions of the account owner.  Noel argues that Liberty Bank owed the Trust a fiduciary duty because the facts of this case "establish a relationship of trust and confidence between a bank and its customers which is more than a debtor/creditor relationship."  *Country Corner Food and Drug, Inc. v. First State Bank and Trust Co. of Conway, Ark.*, 332 Ark. 645, 654, 966 S.W.2d 894, 898 (1998).  Specifically, Noel points to evidence that Liberty Bank possesses "millions of dollars worth of investment securities" owned by the trust, as well as evidence that, pursuant to the custodian agreements, the bank had the discretion to open accounts to hold trust assets at its place of business or another institution.  Further, there are documents on which Liberty Bank referred to itself as a "trustee" for the custody account.  Noel cites decisions where courts have extended the equitable remedy of accounting to nonfiduciaries where the questions of what is owed are too complex for a jury.  *In re Nat'l Audit*

*Def. Network*, 332 B.R. at 919 (citing Dan B. Dobbs, *supra* at § 4.3(5); Eichengrun, *supra* at 470-77).  Here, Noel has alleged that the transfer errors and other matters raised in the complaint are "intricate, complicated, and involve numerous transactions."  On this evidence, the Court cannot say as a matter of law that Liberty Bank owes no duty to Noel to account for its actions with respect to the custodian account.

Assuming that Liberty Bank was entrusted with property belonging to McKee's trust "because of a confidential or trust relationship," *Moskop*, 38 Ark. App. 234, 239, 832 S.W.2d 860, 863, Liberty Bank contends that Noel has not raised a genuine dispute of material fact regarding whether the bank owes McKee's trust any "sum of money" due to improper administration of the custodian account or the assets contained therein.  Liberty Bank argues that, regardless of the various questions and discrepancies about which Noel complains, the unrebutted evidence establishes that all assets received in the custody account for the benefit of Rose McKee and her Trust were properly transferred out of the account.  On the other hand, Liberty Bank has not fully explained the multiple discrepancies in the documents relating to the assets that the bank held on behalf of the Trust.  Indeed, some of these discrepancies are not even addressed by Liberty Bank in its motion for summary judgment or its reply.  In light of the rule that in an action for an accounting the party asked to account for its actions bears the burden of proof, the Court cannot say as a matter of law that Liberty Bank has fully explained the discrepancies identified by Noel relating to the bank's care of the Trust's assets in the custody account.  While providing an accounting in this action may require scrutiny of the books and records of entities other than Liberty Bank, all of those entities, other than Stephens, were chosen by Liberty Bank and used by Liberty Bank in the discharge of its duties to the Trust.  Noel is entitled to an accounting against Liberty Bank "to

determine whether there is, in fact, anything due" the Trust.  *Walters-Southland Inst.*, 217 Ark. at

609-10, 232 S.W.2d at 452.

## CONCLUSION

For the forgoing reasons, Liberty Bank's motion for summary judgment is DENIED.

Document #43.  The stay of discovery is lifted.

IT IS SO ORDERED this 21st day of December, 2011.

_____

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE